IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, JUDGE

Civil Case No.  10-cv-01166-LTB

MARION B. KLIMEK,

       Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner of Social Security,

       Defendant.

_____

ORDER
_____

       Plaintiff, Marion B. Klimek, appeals from the Social Security Administration ("SSA") Commissioner's final decision denying her application for disability insurance benefits, filed pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401-433.  Jurisdiction is proper under 42 U.S.C. § 405(g).  Oral arguments will not materially aid in the resolution of this appeal.  After consideration of the parties' briefs, as well as the administrative record, I AFFIRM the SSA Commissioner's final order.

## I.  STATEMENT OF THE CASE

       Plaintiff seeks judicial review of the Commissioner's decision denying her August 29, 2005 application for disability insurance benefits. [Administrative Record ("AR") 53]  The application was initially denied at the administrative level. [AR 29]  An Administrative Law Judge ("ALJ") subsequently conducted a hearing and issued a written ruling on November 21, 2007, denying Plaintiff's application on the basis that she could perform work existing in significant numbers in the national economy, which precluded her claim of disability (Step

Five). [AR 16-28]  On April 13, 2010, the SSA Appeals Council denied Plaintiff's administrative request for reconsideration, making the denial final for the purpose of judicial review. [AR 42]  Plaintiff timely filed her complaint with this court seeking review of the SSA Commissioner's final decision.

## II.  FACTS

Plaintiff was born on May 22, 1949, and was 58 years of age at the time of the ALJ's decision. [AR 5, 53]  She graduated from high school and has two years of additional education in Germany. [AR 73, 76]  Her prior work history consists of employment in retail sales. [AR 116, 540]  Plaintiff alleges that she became disabled on August 14, 2004, following an accident at work in April 2003. [AR 53, 116]

Plaintiff's medical records reveal that she was involved in an accident at work on April 25, 2003 – when a trunk lid of a car fell on her head – during which she sustained a hyperextention injury to her head, neck and upper body. [AR 20, 116, 201,503]  Plaintiff received treatment for her injury from Mary Dickson, M.D. and Ronald Peveto, M.D. – who she saw monthly for the management of this work-related injury – at Centura Centers for Occupational Medicine from May of 2003 through the time she reached maximum medical improvement ("MMI") on November 17, 2005. [AR 282-480]

In May of 2003, Dr. Peveto assessed a "mild closed head injury" and "cervical neck pain," and assigned Plaintiff work restrictions of no repetitive overhead work and no lifting, carrying, pulling or pushing more than 10 pounds. [AR 195, 473]  Plaintiff underwent an MRI in July of 2003, which reveled some mild degenerative changes at C4-C5 & C6-C7, but no significant narrowing or impingement. [AR 458]

2

On Dr. Peveto's recommendation, Plaintiff was evaluated by G. Thomas Morgan, M.D., on August 26, 2003, regarding her physical therapy and pain management options. [AR 116-118, 448] Dr. Morgan reported that Plaintiff was experiencing occipital headaches and pain in her neck and shoulders. [AR 116] Dr. Morgan diagnosed Plaintiff with an injury to the cervical spine without evidence of a neurological deficit, and probable myofascial pain syndrome with residual trigger points. [AR 117] He provided Plaintiff with trigger post therapy, including injections and post-injection massage therapy, through January 4, 2004. [AR 117, 495-502]

Plaintiff reported no improvement of her condition to Dr. Peveto from September through December of 2003. [AR 437, 432, 426, 422, 418] During this time, on November 3, 2003, Plaintiff underwent an independent medical examination with Peter Weingarten, M.D. [AR 402] Following an examination, Dr. Weingarten determined that Plaintiff was subject to cervical spasms with moderate restriction of motion, and symptoms that are consistent with cervical strain. [AR 104] Dr. Weingarten found that Plaintiff had reduced range of motion in the cervical spine, but she exhibited full range of motion in her upper extremities with no neurological or radicular symptoms. [AR 103] Dr. Weigarten concluded that Plaintiff had not reached MMI, and opined that her work restrictions were appropriate as she was not capable of lifting more than 10 pounds above shoulder height. [AR 104]

Dr. Peveto then referred Plaintiff to Scott Ross, D.O. [AR 412, 407, 405] On March 18, 2004, Dr. Ross diagnosed Plaintiff with post-traumatic headaches and greater occipital neuritis. [AR 180-2, 405] He recommended that Plaintiff undergo an occipital nerve block bilaterally along with prescription medications. [AR 182]

On May 11, 2004, Dr. Peveto indicated that in addition to a mild closed head injury and continued chronic cervical pain, Plaintiff "has developed a mixed headache syndrome now with a vascular component." [AR 388]  On July 16, 2004, Dr. Peveto described her diagnosis as a mild closed head injury, with chronic cervical neck pain and intermittent headaches of a mixed variety. [AR 372] On August 3, 2004, Plaintiff's care was transferred to Dr. Dickson, who noted Plaintiff's increased pain levels and diagnosed "closed head injury with occipital neuritis, cervical neck pain." [AR 368]

Dr. Dickson recommended biofeedback/relaxation training and pain management on October 7, 2004. [AR 355]  Subsequently, Dale Mann, Ph.D, performed a psychological examination and initial evaluation of Plaintiff on November 3, 2004.  [AR 119-122]  Dr. Mann found that Plaintiff was alert, oriented, and cooperative, her speech was clear and coherent, and her memory and concentration were intact. [AR 121]  Dr. Mann's diagnosis included pain disorder with psychological factors. [AR 121]  Plaintiff underwent biofeedback/relaxation training in November and December of 2004. [AR 250-58]  In addition, Plaintiff underwent an MRI of her brain on December 8, 2004. [AR 123-26, 345]  It was "only remarkable" for a 5-6 mm nonspecific lesion. [AR 345]

In January of 2005, Dr. Ross reported that Plaintiff's response to the first two occipital nerve blocks (starting in September of 2004) were transient, although positive, and recommended a third procedure. [AR 158, 160, 362-3]  Also in January 2005, Dr. Ross performed a radio-frequency rhizotomy at Plaintiff's C2-3 level. [AR 148]  After evaluating Plaintiff during a follow-up visit on March 3, 2005, he diagnosed Plaintiff as subject to persistent occipital headaches and concomitant occipital neuritis, and recommended changing Plaintiff's

prescription medication and possibly repeating the facet medial branch block and occipital nerve blocks. [AR 144]  Dr. Ross performed a bilateral C2-3 facet medial branch block in May 2005. [AR 135, 311]

During January through May of 2005, Plaintiff reported to Dr. Dickson no improvement in pain, and an increase in headaches. [AR 333, 325, 320]  On March 29, 2005, Dr. Dickson referred Plaintiff to Dr. Rommet for her reported dizziness. [AR 320] As a result, Plaintiff underwent audiological testing – for tinnitus and dizziness – from May through August of 2005. [AR 183-233]

In May of 2005, Plaintiff underwent another bilateral set of injections from Dr. Ross, as well as bilateral facet rhizotomies in June of 2005.  [AR 131, 311, 307]  In July 2005, Plaintiff reported to Dr. Ross that she still continued to have pain across the base of her head.  [AR 128] On July 22, 2005, Dr. Dickson referred Plaintiff for a consultation related to her surgical options, as she was approaching MMI related to her conservative treatments. [AR 302, 237, 292]

On August 19, 2005, Dr. Dickson noted that Plaintiff had not obtained relief from treatment, including "no marked improvement" from her injections. [AR 297] As such, Dr. Dickson referred Plaintiff back to Dr. Mann for management of her chronic pain. [AR 297]  In August 2005, Dr. Mann again saw Plaintiff and diagnosed her with a pain disorder with psychological factors as well as psychosocial stressors involving marital distress. [AR 236]  Dr. Mann found no problems with Plaintiff's affect, insight, judgment, concentration and memory, and concluded that Plaintiff's current GAF score was 65. [AR 236]  Plaintiff attended group psychotherapy session for pain patients through September 22, 2005. [AR 244-49]

On August 31, 2005, upon referral by Dr. Dickson, a Functional Capacity Evaluation (FCE) of Plaintiff was performed by Deborah Burrell, a registered occupational therapist. [AR 297, 509-515]  The FCE indicated "less than sedentary level for materials handling with a specific weight limit of no lifting more than 10 pounds infrequently, which is no more than one to two times per hour; 5 pounds occasionally, which is no lifting 5 pounds more than three to five times per hour; overhead occasional and frequent was 0 pounds, 3 pounds infrequently. Overhead reaching should also be infrequent." [AR 292, 509-513]

Thereafter, on November 17, 2005, Dr. Dickson found that Plaintiff had reached MMI. [AR 282]  Upon discharge from her care, Dr. Dickson indicated that, pursuant to the FCE, Plaintiff  "is not recommended to lift more than 10 pounds infrequently, which is not more than one time every two hours." [AR 282]  In addition, Dr. Dickson ordered continued medical benefits such as quarterly follow-up visits with Dr. Ross and some physical therapy benefits. [AR 283]

Following this MMI determination, Plaintiff sought an independent medical evaluation from Glen Kelley, M.D. on November 17, 2005. [AR 277-281]  Plaintiff complained to Dr. Kelley of experiencing accident-related chronic, left greater than right neck pain and headaches. [AR 277]  On examination, Plaintiff was alert and cooperative, moved about without any difficulty, had normal range of motion in her shoulder (bilaterally), and her heel to toe walking was normal. [AR 280]  Dr. Kelley also opined that Plaintiff had reached MMI, and should be given a permanent ten pound lifting restriction. [AR 281]

Dr. Ross continued to treat Plaintiff.  In January 2006, he diagnosed her with chronic cervical neck pain with chronic daily headaches and recommended repeat nerve blocks at the C2-3 level. [AR 483]  Plaintiff again underwent radio-frequency rhizotomy at the C2-3 level on July 11, 2006.  Dr. Ross provided follow-up examinations in September and October 2006 with diagnoses of cervicogenic headaches and cervical spine pain.  [AR 491]

### III.  LAW

A five-step sequential evaluation process is used to determine whether a claimant is disabled under Title II of the Social Security Act which is generally defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C.§ 1382c(a)(3)(B); *see also Bowen v. Yuckert*, 482 U.S. 137, 137, 107 S.Ct.  2287, 96 L.Ed.2d 119 (1987).

Step One is whether the claimant is presently engaged in substantial gainful activity.  If she is, disability benefits are denied.  *See* 20 C.F.R. § 404.1520.  Step Two is a determination of whether the claimant has a medically severe impairment or combination of impairments as governed by 20 C.F.R. § 404.1520(c).  If the claimant is unable to show that her impairment(s) would have more than a minimal effect on her ability to do basic work activities, she is not eligible for disability benefits.  Step Three then assesses whether the impairment is equivalent to one of a number of listed impairments deemed to be so severe as to preclude substantial gainful employment.  *See* 20 C.F.R. § 404.1520(d).  If the impairment is not listed, she is not presumed to be conclusively disabled.  Step Four then requires the claimant to show that her impairment(s) and assessed residual functional capacity ("RFC") prevent her from performing work that she

has performed in the past.  If the claimant is able to perform her previous work, the claimant is not disabled.  *See* 20 C.F.R. § 404.1520(e)&(f).

Finally, if the claimant establishes a *prima facie* case of disability based on the four steps discussed, the analysis proceeds to Step Five where the Commissioner has the burden of proving that the claimant has the RFC to perform other work in the national economy in view of her age, education and work experience.  *See* 20 C.F.R. § 404.1520(g).

### IV.  ALJ's RULING

The ALJ ruled that Plaintiff had not engaged in substantial gainful activity since August 14, 2004 (Step One). [AR 18]  The ALJ also found that Plaintiff had the following severe medical impairments:  mild degenerative disc disease of the cervical spine, cervical sprain, myofascial pain syndrome and occipital neuritis (Step Two). [AR 18]  Because the ALJ determinated that she did not have a impairment or combination of impairments that meets or equals a listed impairment (Step Three), the ALJ went on to assess Plaintiff's RFC.  [AR 19]

The ALJ evaluated the evidence and found that Plaintiff retained the RFC to do a range of sedentary work, except that the work:  could require no more than occasional lifting and carrying up to 10 pounds; frequent lifting and carrying of less than 10 pounds; no more than occasional reaching over shoulder height or overhead; no more than occasional crouching and stooping; and no crawling or climbing ladders, ropes, and scaffolds. [AR 20]

As a result of Plaintiff's RFC assessment, the ALJ found that she was not capable of performing her past relevant work (Step Four). [AR 25]  However, the ALJ determined that considering her age, education, work experience and RFC, Plaintiff could perform work existing in significant numbers in the national economy.  [AR 26-28]  Thus, the ALJ denied Plaintiff's

application because she was not under a disability as defined by the SSA – from her alleged disability onset date of August 14, 2004, through November 21, 2007, the date of the ALJ's decision – at Step Five of the sequential evaluation process. [AR 28]  On review, the Appeals Council "found no reason" to reconsider the ALJ's decision. [AR 5]

## V.  STANDARD OF REVIEW

My review here is limited to whether the final decision is supported by substantial evidence in the record as a whole and whether the correct legal standards were applied. *Williamson v. Barnhart,* 350 F.3d 1097, 1098 (10th Cir. 2003); *White v. Barnhart,* 287 F.3d 903, 905 (10th Cir. 2001); *Qualls v. Apfel,* 206 F.3d 1368, 1371 (10th Cir. 2000).  My review of the factual findings is to determine whether they "are based upon substantial evidence and inferences reasonably drawn therefrom; if they are so supported, they are conclusive upon [this] reviewing court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970).  Substantial evidence is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Casias v. Secretary of Health & Human Services,* 933 F.2d 799, 800-01 (10th Cir. 1991) (citations omitted).  With regard to the application of the law, my review is limited to whether the Commissioner applied an incorrect legal standard, or failed to demonstrate reliance on the correct legal standards. *See Winfrey v. Chater,* 92 F.3d 1017, 1019 (10th Cir. 1996).

## VI.  APPEAL

On appeal, Plaintiff contends that the ALJ:  (a) did not perform a proper credibility analysis; (b) did not give the appropriate weight to the opinions of her physicians; and (c) erred in concluding at Step Five that Plaintiff was able to perform work existing in the national economy.

### A.  Credibility

Plaintiff first asserts that the ALJ erred in assessing her credibility when determining her RFC.  Specifically, she asserts that the ALJ erred in concluding that Plaintiff's "medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible" as related to the effects of her headaches on her ability to sustain a normal workday.  [AR 23]

After determining that a claimant has medically determinable impairments that could reasonably be expected to produce the alleged symptoms, as was the case here, the ALJ must then evaluate the intensity and persistence of the symptoms in order to determine how the symptoms limit the capacity for work.  20 C.F.R. § 404.1529.  Such an inquiry "requires the adjudicator to make a finding about the credibility of the individual's statements about the symptom(s) and its functional effects."  Social Security Ruling 96-7p, 1996 WL 374186 ("SSR 96-7p").

"In determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including the individual's own statements about symptoms,

statements and other information provided by treating or examining physicians . . . and any other relevant evidence in the case record. An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence." SSR 96-7p "The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision." *Id.*

Credibility determinations are peculiarly the province of the finder of fact. *Diaz v. Secretary of Health & Human Servs.*, 898 F.2d 774, 777 (10th Cir. 1990). In reviewing the ALJ's credibility determinations, the court will usually "defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess witness credibility." *Casias v. Secretary of Health & Human Services*, *supra*, 933 F.2d at 801.

In his order the ALJ agreed with Plaintiff's assertion that her upper body injury restricts her to lifting and carrying no more than 10 pounds. [AR 21] However, as to her subjective complaint that she is "additionally limited by unpredictable headaches that require her to use medication that, in turn, causes her to take lengthy naps," the ALJ found that he was "not convinced of her inability to sustain a normal workday." [AR 21-2] In support of this determination, the ALJ relied on the following:

> Despite her claims of frequent, incapacitating headaches, her primary treating physicians have repeatedly referred to her as comfortable, and in no distress, during examinations over more than a two-year period. ... Patient visit records do not depict her headache complaints as uncontrollable or ever-present, referring to them as intermittent, or indicating that they were abated within an hour when she took her medication. The claimant testified that she had excessive drowsiness when she took medication to arrest her headaches, but this side effect is absent from treatment records while she was working and using prescription medication with good results. The claimant continued to work for well over a year after the

>onset of her symptoms, and patient records indicate that she was able to tolerate her duties when she was assigned lighter exertional work, although she began to experience increased stress because her job tasks were increased. Her treating physician felt that she remained capable of working despite her condition, and she testified that she left work because her employer was not appropriately accommodating her 10-pound weight lifting restriction, as opposed to the chronicity of her headaches or the side effects of her medications. And, despite stating that she left work for reasons related to her impairments, she told her treating psychologist in late 2004 that she did not intent to return to work because she wanted to retire and travel with her spouse. In fact, she has reported that she traveled from Colorado to Paris for three weeks. Although the claimant states that her condition has worsened over time, the remaining patient notes continue to document improvement in her complaints with various treatment modalities. Her treating psychologist reported no significant psychological problems and assessed her overall mental limitations to be mild. The undersigned has considered the claimant's testimony regarding her medications, their side effects and her reduced daily activities, but these factors are outweighed by her statements within the record as well as the lack of supportive observations of treating and examining physicians. After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible. [AR 22-23]

Plaintiff argues that the ALJ erred in failing to apply the requirements of SSR 96-7p, and that the ALJ's credibility determination is not supported by substantial evidence. In so arguing, Plaintiff points to the evidence in the record that undermines or does not support the ALJ's determinations that "the patient visit records to not depict her headache complaints as uncontrollable or ever-present" and that "the remaining patient notes continue to document improvement in her complaints with various treatment modalities." In addition, Plaintiff asserts that the ALJ's finding that Plaintiff did not return to work because she wanted retire and travel with her husband was "based on information taken out of context."

While there is evidence in the record to support Plaintiff's claim that her pain and the resulting impact on her activity level was consistently reported, as well as the fact that she

actively sought medical treatment, the evidence relied upon by the ALJ is sufficient to support his decision to reject her claim that she is unable to work on a continued basis. The ALJ considered and discussed various factors bearing on the credibility of Plaintiff's subjective complaints related to her inability to work as required by SSR 96-7p (the location, duration, and intensity of her pain; factors that aggravated the symptoms; the type, dosage, effectiveness and side effects of medication and other treatment; treatment other than medication she has received for pain; her daily activities; etc.). I disagree with Plaintiff's argument that the ALJ's credibility determination was improperly based on "an intangible or an intuitive notion." SSR 96-7p.

As a result, the ALJ properly considered the medical evidence and assessed Plaintiff's credibility regarding her pain, her medication, and her inability to sustain a normal workday. *See Talley v. Sullivan*, 908 F.2d 585, 587 (10th Cir.1990)(an ALJ's credibility determinations are generally treated as binding on review); *Casias v. Secretary of Health & Human Services, supra,* 933 F.2d 800-01 (reviewing courts are neither re-weigh the evidence nor substitute its judgment for that of the agency).

**B. Weight to Treating Physician Opinions**

Plaintiff next argues that the ALJ erred in failing to give controlling weight to the opinions of her treating physicians. A treating physician's opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in the individual's case record." Social Security Ruling 96-2p, 1996 WL 374188 ("SSR 96-2p"). Even if a treating physician's opinion is not entitled to "controlling weight," it is "still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527." SSR 96-2p (these

factors include length of the treatment relationship; frequency of examination; nature and extent of the treatment relationship; supportability; consistency; and specialization).

Plaintiff argues that her treating physicians' opinions were consistent and were supported by the medically-acceptable clinical and diagnostic techniques for her type of condition, and thus they should have been given controlling weight by the ALJ.  As a result, Plaintiff argues that the ALJ failed to give proper weight to Dr. Dickson's opinion that Plaintiff's physical restrictions included those identified in the Functional Capacity Evaluation ("FCE") performed by Ms. Burrell in August 2005.  Specifically, Plaintiff refers to the restrictions in the FCE that indicate that she is physically limited in her ability to perform:  repetitive lifting; lifting over shoulder height; and away-from-the-body lifting.

As an initial  matter I note that, contrary to Plaintiff's argument here, the records do not indicate that Dr. Dickson  accepted or applied the full results of the FCE.  There is no indication in the medical records that it was Dr. Dickson's opinion that Plaintiff's functioning was consistent with the FCE, expect to the extent that the FCE recommends that Plaintiff not lift more than 10 pounds infrequently. [AR 282]

With regard to the FCE, the ALJ noted that Ms. Burrell indicated that the results of her evaluation were borderline, as the claimant had put forth sub-maximal effort based on her "observation of pain complaints that were out of proportion to the claimant's movement patterns, to two equivocal and one invalid hand testing result, and to an invalid occasional material handling testing result." [AR 23-24, 509]  After noting an example of inconsistent rating by Plaintiff of her symptoms with test results related to material handling, the ALJ concluded that "claimant's less than maximal efforts – particularly in the area of materials handling – indicate

14

that the conclusion of this evaluation represents the least she could perform, and gives it limited weight." [AR 24]   The ALJ properly addressed the FCE results and gave them limited weight. As such, I disagree with Plaintiff's assertion that the ALJ improperly substituted his own opinion for that of a medical provider; rather, the ALJ relied upon the internal inconsistencies and unreliability of the results as stated therein.  As such, the ALJ properly explained the weight he gave to the FCE results.  *See Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004).

In a related argument, Plaintiff contends that the ALJ improperly failed to consider the opinion of Michael Fitzgibbons, a vocational rehabilitation counselor who evaluated Plaintiff in August 2006, and concluded that:  her physical limitations were in the less than sedentary range; that she incapable of returning to work on a full-time basis in any occupation; and that she did not have any transferable skills. [AR 98, 25]

The ALJ initially noted that "Mr. Fitzgibbons is not a physician or treatment provider, and his conclusions are not considered that of an acceptable source of opinion evidence."  The ALJ then found that he was "hired by counsel, he conducted no physical testing of the claimant, and his conclusions [were] clearly based upon the claimant's own subjective statements, which are not fully supported within the record." As such, the ALJ gave Mr. Fitzgibbons' vocational opinion no weight. [AR 25]  Based on the foregoing, I reject Plaintiff's argument to the extent she asserts that the ALJ failed to consider Mr. Fitzgibbons' opinion and, in turn, failed to consider the entire record.

Finally, to the extent that Plaintiff contends that the ALJ improperly ignored Dr. Mann's opinion – because the ALJ's order failed to address Dr. Mann's  "opinion" that there was no attempt by her to manipulate her symptoms during their discussions [AR 121, 236] – it is clear

that such observation by Dr. Mann related to the Plaintiff's self-reporting during his evaluations. It is not a medical opinion related to Plaintiff's functionality or ability to work. Rather, it consists of evidence to be used in assessing or weighing his medical opinions and in determining her credibility, as discussed above. Therefore, the ALJ did not fail to consider Dr. Mann's opinion.

Based on the foregoing, I find no error by the ALJ in assessing the weight afforded to the medical opinions of the various physicians as alleged by Plaintiff.

## C. Step Five Determination

Finally, Plaintiff asserts that the ALJ erred when he determined – at Step Five of the sequential evaluation – that jobs exist in the national economy that Plaintiff could do despite her RFC limitations, age, education, and work experience. Specifically, Plaintiff argues that application of the medical-vocational guidelines (the "grids") to her situation required a determination of disability because she has no skills which are transferable to a semi-skilled position.

The grids are tables which evaluate a claimant's ability to work by matching her age, education, and work experience with her work capability. 20 C.F.R. Pt. 404, Subpt. B, App. 2 (1991); *see also Hargis v. Sullivan*, 945 F.2d 1482, 1490 (10th Cir.1991). Plaintiff argues that because she does not have transferable skills which would lead to direct entry into skilled employment, application of Rules 201.01 and 201.02 of the grids – which provides that in order to find transferability of skills to skilled sedentary work for individuals who are of advanced age (55 and over), there must be very little, if any, vocational adjustment required in terms of tools, work processes, work setting or the industry – mandate a finding of disability. 20 C.F.R. Pt. 404,

Subpt. B; *see also* Social Security Ruling 82-41, 1982 WL 31389 ("SSR 82-41"); Social Security Ruling 83-5a, 1983 WL 31250 ("SSR 83-5a")(indicating that there is no provision in the Social Security Act for an ALJ to rebut the conclusion directed by the grids that the claimant is disabled).

The ALJ asked the vocational expert at Plaintiff's hearing if any occupations existed which could be performed by an individual with the same age, education, past relevant work experience and RFC as the claimant which, in addition, which would only "require skills acquired in the claimant's past relevant work that would require very little, if any, vocational adjustment in terms of tools, work processes, work setting or type of industry." [AR 27]  The vocational expert testified that a job that would be readily transferrable would be the occupation of "Check Cashier," which the expert had personally reviewed. [AR 542-43]  The vocational expert indicated that this position would essentially "required an individual to cash checks, prepare money orders, receive payments and issue receipts for such items, and to log fees charged for checking cashing services." [AR 546]  In addition, the vocational expert "also remarked that there might be a report due at the end of the shift, when the case drawer would need to be balanced, and each establishment had its own manner of performing this task[; t]he report was simple, and consisted of one page, where the employee needed to add the transactions for the day." [AR 27, 547]  The expert further testified that "this particular job task could be learned after a short demonstration, within the first day of employment." [AR 27, 548-50 ]

The ALJ found that "the claimant received eight years of schooling in Germany, followed by a three year training program as a pharmacy technician, and that she has been employed for many years as a Sales Person. Based on the testimony of the vocational expert, the

17

undersigned concluded that the claimant had acquired work skills from past relevant work that are transferable, with very little vocational adjustment, to another occupation, and with jobs existing in significant numbers in the national economy." [AR 27]

I first address Plaintiff's claim that only one potential job – that of a check cashier – is insufficient because Rule 201.00 requires that the skills must be transferable to "a significant range of work." However, the vocational expert testified there were 923,000 check cashier positions available nationally, and 1,840 jobs in Colorado. [AR 542] The case law holds that such numbers are significant. *See Trimiar v. Sullivan*, 966 F.2d 1326, 1330 (10th Cir. 1992); *Botello v. Astrue*, 2010 WL 1645976 (10th Cir. 2010)(unpublished). Plaintiff does not refer me to any case law for the proposition that one type of job fails to meet the definition of a "significant range of work" as set forth in Rule 201.00.

Plaintiff's primary argument of error here is that because she has no skills that are transferable, the ALJ was requires to apply the grid rules and the resulting determination of disability. In so arguing, Plaintiff contends that the ALJ's determination that she could perform the duties of the job of cashier clerk was not supported by substantial evidence.

In support of her argument, Plaintiff refers to her testimony that at her prior sales job she operated a non-computerized cash register, but did not have to balance the cash drawers at the end of the day. [AR 534] Consistent with this testimony, the vocational expert acknowledged that Plaintiff would have some type of vocational adjustment in terms of learning how to balance a cash drawer since she had not done it before. [AR 549]

However, in response to a follow-up question posed by the ALJ, the vocational expert testified that an individual would only require a one-day on the job training period (a "short

demonstration") to balance out a cash drawer in accordance with a company's specific procedure. [AR 549-50] The ALJ properly relied on this testimony which was sufficient to support his ruling that Plaintiff's work skills from her past relevant work are transferable, with very little vocational adjustment, to the occupation of check cashier and, as such, I find no error.

Accordingly, IT IS ORDERED that the Commissioner's decision is AFFIRMED.

Dated: July 20, 2011, in Denver, Colorado.

BY THE COURT:

   s/Lewis T. Babcock
LEWIS T. BABCOCK, JUDGE